# ASSET PURCHASE AGREEMENT

by and between

## NCOAT, INC., NTECH, INC., MCC, INC., AND HIGH PERFORMANCE COATINGS, INC.

"Seller"

and

## FORT ASHFORD FUNDS, LLC, or Assigns

"Buyer"



EXHIBIT
A

THIS ASSET PURCHASE AGREEMENT (together with all *Exhibits*, *Schedules* and other documents and instruments incorporated herein by reference, the "Agreement") is made and entered into as of the __ day of August, 2010, by and between NCOAT, INC., a corporation organized under the laws of the State of Delaware and doing business in North Carolina, NTECH, INC., a Delaware corporation, MCC, INC., a Pennsylvania corporation, doing business as Jet Hot, and HIGH PERFORMANCE COATINGS, INC., an Oklahoma corporation (collectively, "Seller") and FORT ASHFORD FUNDS, LLC, a limited liability company organized under the laws of California, or its Assigns, ("Buyer").

## WITNESSETH:

WHEREAS, Seller is in the business (the "Business") of coating products for customers and in connection therewith providing thermal management, corrosion resistance, friction modifying and decorative coatings, and other services to its customers; and

WHEREAS, Seller's corporate offices are located at 7237 Pace Drive, Whitsett, North Carolina, and nCoat, Inc.'s conducts its business operations at that location, nTech, Inc. conducts its business operations at 7237 Pace Drive, Whitsett, North Carolina, MCC, Inc., d/b/a/ Hot Jet conducts its business operations at 7237 Pace Drive, Whitsett, North Carolina, 400 Glade Avenue, Oklahoma City, OK, and 1840 W. Drake Dr. Suite 102, Tempe, AZ, and High Performance Coatings, Inc. conducts its business operations at 7237 Pace Drive, Whitsett, North Carolina, 1840 W. Drake Drive, Suite 102, Tempe, AZ, and 400 Glade Avenue, Oklahoma City, OK; and

WHEREAS, Seller has solicited an offer from Buyer for the purchase of substantially all of Seller's assets used in connection with the Business; and

WHEREAS, Buyer is a limited liability company organized under the laws of California; and

WHEREAS, Seller desires to sell and Buyer desires to purchase substantially all of Seller's assets used in connection with the Business "free and clear" of all liens, security interests, claims, encumbrances and other interests pursuant to a sale order under Section 363 of the Bankruptcy Code in Seller's respective chapter 11 cases (the "Chapter 11 Cases") to be filed in the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") and upon such other terms and conditions as are set forth herein.

NOW, THEREFORE, for and in consideration of the premises, the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1**    <u>Actions</u> shall have the meaning set forth in Section 5.1.5.

**1.2**    <u>Allocation</u> shall have the meaning set forth in Section 3.4.

**1.3**    <u>Assigned Contracts and Leases</u> shall have the meaning set forth in Section 2.1.2.

**1.4**    <u>Assignee</u> shall have the meaning set forth in Section 5.3.3.

**1.5**    <u>Assumed Liabilities</u> shall have the meaning set forth in Section 2.3.3.

**1.6**    <u>Authorized Purpose</u> shall have the meaning set forth in Section 8.6.2.

**1.7**    <u>Bankruptcy Code</u> shall mean title 11 of the United States Code, as amended.

**1.8**    <u>Bankruptcy Court</u> shall mean the United States Bankruptcy Court for the Middle District of North Carolina.

**1.9**    <u>Bankruptcy Court Approval</u> shall mean the Bankruptcy Court's approval of this Agreement and sale of the Purchased Assets to Buyer in accordance with the terms and conditions hereof.  Bankruptcy Court Approval shall become effective upon entry of the Sale Order substantially in the form annexed hereto as *Exhibit 2* (provided that any material change in the form of the order must be approved by Buyer).

**1.10**    <u>Bankruptcy Rules</u> shall mean the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court.

**1.11**    <u>Business</u> shall mean the Seller's business of coating products for customers and in connection therewith providing thermal management, corrosion resistance, friction modifying and decorative coatings, and other services to its customers.

**1.12**    <u>Buyer Assets</u> shall have the meaning set forth in Section 9.7.

**1.13**    <u>Buyer's Receivables</u> shall have the meaning set forth in Section 10.2.

**1.14**    <u>Capital Leases</u> shall have the meaning set forth in Section 2.1.1.

**1.15**    <u>CERCLA</u> means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

**1.16**    <u>Chapter 11 Cases</u> shall have the meaning set forth in the Recitals.

**1.17**    <u>Claim</u> shall have the meaning set forth in Section 11.3.

**1.18**   <u>Closing</u> shall have the meaning set forth in Section 9.1.

**1.19**   <u>Closing Date</u> shall have the meaning set forth in Section 9.1.

**1.20**   <u>COBRA</u> shall mean the Consolidated Omnibus Budget Reconciliation Act, as amended.

**1.21**   <u>Committee</u> shall have the meaning set forth in Section 10.1.1.

**1.22**   <u>Confidential Information</u> shall have the meaning set forth in Section 6.1.

**1.23**   <u>Consequential Damages</u> shall have the meaning set forth in Section 11.7.

**1.24**   <u>Cure Payments</u> shall have the meaning set forth in Section 2.3.2.

**1.25**   <u>Deposit</u> shall have the meaning set forth in Section 3.2.

**1.26**   <u>Environment</u> means any and all environmental media, including without limitation ambient air, surface water, ground water, drinking water supply, land surface or subsurface strata, and also means any indoor location other than any such location that is intended to contain Hazardous Substances and that is constructed, maintained and operated in compliance with all applicable Environmental Laws.

**1.27**   <u>Environmental Laws</u> means any and all existing federal, state, local and foreign statutes, laws (including common or case law), regulations, ordinances or rules, and any judgments, judicial decisions, orders, decrees, plans, injunctions, Environmental Permits, or governmental restrictions, arising thereunder, relating to the protection of human health or safety or the Environment or to emissions, discharges or Releases of any Hazardous Substance into the Environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of any Hazardous Substance or the containment, removal or remediation thereof.

**1.28**   <u>Environmental Liabilities</u> means any and all liabilities arising in connection with or in any way relating to the Seller's Business, past or present, whether contingent or fixed, actual or potential, known or unknown, which arise (i) under or relate to matters governed by Environmental Laws or arise in connection with or relate to any matter disclosed in *Schedule 5.1.8* and (ii) from or relate in any way to actions occurring or conditions existing before the Closing Date.

**1.29**   <u>Environmental Permits</u> means any and all governmental permits, licenses, concessions, grants, franchises, agreements, authorizations, registrations or other governmental approvals issued or required under any Environmental Laws.

**1.30**   <u>Equipment</u> shall have the meaning set forth in Section 2.1.1.

**1.31** <u>Escrow Agent</u> shall mean the law firm of Northen Blue, LLP, acting in the capacity as escrow agent under the terms of this Agreement.

**1.32** <u>Excluded Assets</u> shall have the meaning set forth in Section 2.2.

**1.33** <u>Excluded Liabilities</u> shall have the meaning set forth in Section 2.3.4.

**1.34** <u>Future Payment Obligations</u> shall have the meaning set forth in Section 2.3.2.

**1.35** <u>Hazardous Substance</u> means any and all environmental pollutants and contaminants, and any and all toxic, caustic, radioactive or otherwise hazardous materials, substances or wastes that are regulated under any Environmental Laws, and includes, without limitation, petroleum and its derivatives and by-products, and any other hydrocarbons.

**1.36** <u>Hired Employees</u> shall have the meaning set forth in Section 9.5.2.

**1.37** <u>Information</u> shall have the meaning set forth in Section 8.6.1.

**1.38** <u>Intellectual Property</u> shall mean all intellectual property and proprietary rights of any kind, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including without limitation any registration and applications for any of the foregoing); (iv) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, and methodologies; (v) computer software, computer programs, and databases (whether in source code, object code or other form); and (vi) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

**1.39** <u>Inventory</u> shall have the meaning set forth in Section 2.1.3.

**1.40** <u>Liens</u> shall have the meaning set forth in Section 2.1.

**1.41** <u>Disputed Lease</u> shall have the meaning set forth in Section 3.1.3.

**1.42** <u>Material Adverse Change</u> means any event, violation, inaccuracy, circumstance

or other matter that has had or reasonably would be expected to have (i) a material adverse effect on the business, assets, properties, liabilities, results of operations, or financial condition of the Business, (ii) a material adverse diminution in the value of the Business or the Purchased Assets or (iii) a material adverse effect on the ability of Seller to consummate the transactions which are the subject of or perform their obligations under this Agreement; provided that such term shall exclude any adverse change, event, development, or effect arising from or relating to (1) general business or economic conditions affecting the industry in which Seller operates so long as such conditions have not had a materially disproportionate effect on the Business, (2) changes in United States generally accepted accounting principles so long as such changes have not had a materially disproportionate effect on the Business, (3) changes in law, rules, regulations, orders, or other binding directives issued by any governmental body or (4) the occurrence of a material adverse disruption in commercial banking or finance in the United States..

1.43    Miscellaneous Assets shall have the meaning set forth in Section 2.1.7.

1.44    N&C shall mean Nicholls & Crampton, P.A.

1.45    Office/Plant shall mean the Seller's corporate office at 7237 Pace Drive, Whitsett, North Carolina, and nCoat, Inc.'s at 7237 Pace Drive, Whitsett, North Carolina, nTech, Inc.'s at 7237 Pace Drive, Whitsett, North Carolina, MCC, Inc.'s at 7237 Pace Drive, Whitsett, North Carolina, 400 Glade Avenue, Oklahoma City, OK, and 1840 W. Drake Dr. Suite 102, Tempe, AZ, and High Performance Coatings, Inc.'s at 7237 Pace Drive, Whitsett, North Carolina, 1840 W. Drake Dr. Suite 102, Tempe, AZ, and 400 Glade Avenue, Oklahoma City, OK .

1.46    Petition shall have the meaning set forth in Section 6.6.1.

1.47    Permits shall have the meaning set forth in Section 2.1.7.

1.48    Petition Date shall have the meaning set forth in Section 7.1.4.

1.49    Purchase Price shall have the meaning set forth in Section 3.1.

1.50    Purchased Assets shall have the meaning set forth in Section 2.1.

1.51    Release means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the Environment (including, without limitation, the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Substance).

1.52    Sale Hearing shall mean the final hearing by the Bankruptcy Court to approve the proposed sale.

1.53    Sale Order shall mean the final order by the Bankruptcy Court approving the

sale, with such Order entered in a form and manner acceptable to Buyer.

**1.54    Sale Procedures Order** shall mean the final order by the Bankruptcy Court approving the sale procedures with such Order entered in a form and manner acceptable to Buyer.

**1.55    Seller's Employee Benefit Plans** shall have the meaning set forth in Section 2.3.4.6

**1.56    Seller Loans Payable** shall have the meaning set forth in Section 2.1.4.

**1.57    Seller Receivables** shall mean any amount due or owing the Seller as of the Closing Date.

**1.58    Tax** shall have the meaning set forth in Section 9.4.

**1.59    Warehouse** shall mean Seller's warehouse located at 7237 Pace Drive, Whitsett, North Carolina    1840 W. Drake Dr. Suite 102, Tempe, AZ and 400 Glade Avenue, Oklahoma City, OK.

**1.60    WARN Act** shall mean the Worker Adjustment and Retraining and Notification Act, 29 U.S.C. § 2101 et seq.

**1.61    ZOF** shall mean Zanett Opportunity Fund, Ltd., a Bermuda corporation. .

**1.62    ZOF Sale and Leaseback Agreement** shall mean that Asset Purchase and Sale and Leaseback Agreement dated as of August 26, 2009 by and between ZOF and nCoat, Inc. (the equipment subject to the Agreement is in storage at Seller's North Carolina facility and not used in Seller's production or Business activity).


### ARTICLE 2
### PURCHASE AND SALE OF ASSETS

**2.1    Purchased Assets.**    Subject to the terms, conditions, representations and warranties set forth in this Agreement and on the basis of and in reliance upon the covenants and other obligations set forth in this Agreement, at Closing Seller shall sell, convey, transfer, assume and assign and deliver to Buyer, and Buyer shall purchase from Seller all of Seller's right, title and interest in and to those assets, properties, and rights described in Sections 2.1.1 through 2.1.7 set out below, which assets constitute and are intended to constitute all of the assets (i) used by Seller in its production lines and (ii) necessary to the operation of its Business (referred to collectively as the "Purchased Assets"), specifically excluding, without limitation, those assets described in Section 2.2 hereof, on an "AS IS, WHERE IS" basis except as otherwise specifically provided herein, **free and clear** of any and all liens, claims, mortgages, deeds of trust, security interests.

restrictions, prior assignments, liabilities (other than the Assumed Liabilities) obligations, encumbrances, charges, and other interests of any and every type, kind, nature or description whatsoever, whether asserted or unasserted, known or unknown, perfected or unperfected, recorded or unrecorded, scheduled or unscheduled, inchoate or choate, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, whether arising before or after the Chapter 11 Cases are filed, or imposed by agreement, statute, common law, equity or otherwise (collectively, the "Liens"), including, but not limited to, Liens asserted by Debtor's customers, shareholders, employees, secured creditors, landlords and equipment lessors, tax authorities, priority creditors, administrative expense claimants, and all other persons, and all in accordance with Sections 363 and 365 of the Bankruptcy Code. The Purchased Assets are as follows:

2.1.1 **Equipment.** All machinery, equipment, and spare parts therefor (the "Equipment") owned by Seller, including Equipment subject to capital leases, i.e., secured sales transactions denominated as leases (hereinafter "Capital Leases") as determined by the Bankruptcy Court. *Schedule 2.1.1(A)* is a true and correct list, as of the date hereof, of all Equipment owned by Seller that is not subject to any lease, and *Schedule 2.1.1(B)* is a true and correct list, as of the date hereof, of all Equipment owned by Seller that is subject to Capital Leases;

2.1.2 **Assigned Contracts and Leases.** All of Seller's true leases of Equipment and other executory contracts (including purchase orders) and unexpired leases (the "Assigned Contracts and Leases") that Buyer elects prior to the Closing Date to have Seller assume and assign to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code. *Schedule 2.1.2* is a true and correct list, as of the date hereof, of all Assigned Contracts and Leases that Buyer presently intends to have assumed and assigned by Seller. Buyer shall have the right to amend *Schedule 2.1.2* at any time prior to the Closing Date;

2.1.3 **Inventory.** All inventory (the "Inventory") owned by Seller, including all raw materials, plastic and metal scrap/waste material, work-in-progress, and finished goods. *Schedule 2.1.3* is a true and correct list, as of the date hereof, of all Inventory owned by Seller;

2.1.4 **Seller Receivables.** All of Seller's accounts receivable (the "Seller Receivables");

2.1.5 **Seller Loans Payable.** The pre-petition secured loans payable in the principal amount of $150,000, owed by Seller to Buyer (the "Seller Loans Payable"), evidenced by (i) a joint Promissory Note in the original principal amount of $100,000 dated July 28, 2010, secured under the terms of security agreements and by the Forms UCC-1 filed by Buyer, and (ii) a joint Promissory Note in the original principal amount of $50,000 dated August 11, 2010, secured under the terms of security agreements and by the Forms UCC-1 filed by Buyer (collectively, the "Pre-Petition Loan Documents"). On or before Closing, Buyer and Seller shall determine the aggregate loan balance,

calculated according to the Pre-Petition Loan Documents (the "Loan Balance"), and Seller shall pay at Closing that amount to Buyer, either from the Purchase Price proceeds or as a credit against the Purchase Price at Closing;

2.1.6  **Name/Website.** All right, title and interest in names nCoat, Inc., ntech, Inc., MCC, Inc., d/b/a Jet Hot, and High Performance Coatings, Inc., or any variation thereof and any trademarks or logos used in connection therewith, and any and all trade names utilized by the Debtor, including, without limitation, the trade names "Jet-Hot", "HPC", "nCoat", "High Performance Coatings", "nPowered" or "Sterling", and all websites and domain names used by Seller;

2.1.7  **Miscellaneous Assets.** All goodwill, furniture, leasehold improvements, fixtures, and appurtenances, regrind material, computers, software, Intellectual Property, and technology rights owned or utilized by the Debtor, including all blending and compounding processes and including, without limitation, all right, title or interest of the Debtor in U.S. Patent No. 7,562,647 and U.S. Patent No. 7,559,991, all engineering designs, testing schemes, test results, drawings, and like documents, production processes, books and records, transferable licenses and permits (the "Permits") for conducting the Business, and all other assets used by Seller in conducting the Business, in addition to those assets described in Sections 2.1.1 through 2.1.5 and related *Schedules* (the "Miscellaneous Assets"). *Schedule 2.1.7* is a true and correct list, as of the date hereof, of all Miscellaneous Assets owned by Seller.

2.2  **Excluded Assets.** Seller shall retain from and after Closing all of its right, title and interest in and to all assets, properties and rights not included in the definition of Purchased Assets, and shall exclude, without limitation, from the sale, conveyance, assignment and transfer to Buyer, all of the following assets, properties and rights of Seller (collectively, the "Excluded Assets"):

2.2.1  **Cash.** All of Seller's cash on hand and deposits in banks, cash equivalents and investments;

2.2.2  **Assets Owned By Customers.** All assets owned by customers of Seller. *Schedule 2.2.2* is a true and correct list, as of the date hereof, of all of Seller's customers, who own assets that are in Seller's custody, possession or control and, for each such customer, all of the assets owned by it that are in Seller's custody, possession or control;

2.2.3  **Real Estate.** All real estate owned by Seller, if any;

2.2.4  **Employee Benefit Plan Assets.** All rights of Seller in connection with and all assets (including bank accounts) relating to any of Seller's Employee Benefit Plans;

2.2.5  **Certain Encumbered Equipment.** That certain equipment (i) specifically itemized in that Uniform Commercial Code File No. 2007030506131 dated 03/05/2007 filed against MCC, Inc. in Office of the Secretary of the Commonwealth of Pennsylvania in favor of First Tennessee Bank National Association, and assigned by

First Horizon Bank, a division of First Tennessee Bank National Association, to Michael Novakovic by UCC Amendment filed on 06/11/2009, File Number 2009061106413 (such equipment is in storage at Seller's North Carolina facility and not used in Seller's production or Business activity), and (ii) itemized in the ZOF Sale and Leaseback Agreement (the equipment subject to such Agreement is in storage at Seller's North Carolina facility and not used in Seller's production or Business activity). The equipment subject to the provisions of this Paragraph 2.2.5 is listed on *Schedule 2.2.5*.

**2.2.6 Other Assets.** All contract rights that are not Assigned Contracts and Leases, contractual rights of indemnification, notes receivable and other debts owed to Seller, refunds, legal suits, claims, injunctions and other causes of action including without limitation avoidance and recovery actions under the Bankruptcy Code, and all expenses and payments pertaining to the Business which have been prepaid, advanced or deposited by or on behalf of Seller prior to the Closing Date.

**2.3    Liabilities.**

**2.3.1** All of the Purchased Assets will be sold, conveyed and/or assigned to Buyer free and clear of all Liens arising prior to Closing.

**2.3.2** Seller, at its expense except to the extent of the Buyer Cost defined below, shall pay at Closing, all cure payments (the "Cure Payments") as required by order of the Bankruptcy Court for assumption and assignment of the Assigned Contracts and Leases on *Schedule 2.1.2*. As used herein, the Cure Payments shall include all liabilities and obligations owed by Seller under the Assigned Contracts and Leases which arise prior to Closing.    Seller shall be responsible to pay when due all future payment obligations (the "Future Payment Obligations") under the Assigned Contracts and Leases that become due prior to Closing. At Closing, Buyer will pay up to $50,000 (the "Buyer Cure Cost") toward the Cure Payments, and the total liabilities and obligations incurred (including Cure Payments and Future Payment Obligations) by Buyer in connection with the Assigned Contracts and Leases shall not exceed that $50,000 amount   in the aggregate. Seller shall be responsible to pay at Closing any amount then owing on the Leases in excess of the Buyer Cure Cost Any dispute regarding a Cure Payment or other amount owed in accordance with this subsection will be submitted to and decided by the Bankruptcy Court.

**2.3.3** Buyer will assume at Closing and will perform and discharge the following liabilities and obligations of Seller relating to the Business or any of the Purchased Assets incurred in the ordinary course of business (collectively, the "Assumed Liabilities"):

**2.3.3.1**       all liabilities and obligations under the Assigned Contracts and Leases that arise after Closing;

**2.3.3.2**       all liabilities and obligations that arise out of the Buyer's conduct of its business operations  or ownership or operation of any of the Purchased

Assets after Closing.

2.3.4  Buyer shall in no event assume or be responsible in any way for any liability or obligation of Seller not specifically assumed under this Agreement, and Seller shall retain full responsibility for all liabilities and obligations not specifically assumed by Buyer, whether known or unknown, liquidated or unliquidated, contingent, fixed, accrued or disclosed (collectively, the "Excluded Liabilities"). Specifically, but without limiting the generality of the foregoing, Buyer shall not assume or otherwise be liable for Excluded Liabilities, whether now existing or hereafter arising, with respect to:

2.3.4.1    .  employees or former employees of Seller, including without limitation any liability for accrued salaries, wages, commissions, bonuses, payroll Taxes, severance pay entitlements, health, medical, retirement, vacation (except as provided in Sections 9.5.2 and 9.5.4 for Hired Employees) or deferred compensation benefits or any other obligations or expenses arising out of or relating to the employment by Seller of its employees or Seller's termination of such employees, including the terminations effected by Seller pursuant to this Agreement;

2.3.4.2    the Worker Adjustment and Retraining and Notification ("WARN") Act, 29 U.S.C. § 2101 et seq.;

2.3.4.3    the Consolidated Omnibus Budget Reconciliation Act, as amended ("COBRA") (including liabilities for violations thereof) for all "qualifying events" (as defined in COBRA) occurring with respect to employees and their dependents prior to and on the Closing Date, including qualifying events that occur as a result of the sale of the Purchased Assets contemplated by this Agreement;

2.3.4.4    the representations, warranties, covenants or agreements of Seller contained in this Agreement or in any misrepresentation in any certificate or document delivered to Buyer by or on behalf of Seller on or before the Closing Date pursuant to this Agreement or in connection with the transactions contemplated hereby;

2.3.4.5    contingent liabilities of Seller of any kind arising or existing prior to Closing, whether known or unknown, asserted or unasserted;

2.3.4.6    any pension, profit-sharing, savings, retirement, health, medical, life, disability, dental, deferred compensation, stock option, bonus, incentive, severance pay, group insurance or similar employee plans or arrangements, or under any policies, handbooks, customer or practice, collective bargaining agreements, or employment agreements (collectively, the "Employee Benefit Plans");

2.3.4.7    any claim for personal injury (including worker's compensation or otherwise), property damage, product recall, product liability or strict liability arising or existing prior to Closing whether known or unknown, asserted or unasserted;

**2.3.4.8**    any claim alleging damage to the environment with respect to Seller's operation of the Business arising or existing prior to Closing, whether known or unknown, asserted or unasserted;

**2.3.4.9**    any claim alleging unlawful violation or infringement by Seller of any Intellectual Property of any other person, whether known or unknown, asserted or unasserted;

**2.3.4.10**    any claim alleged by a non-Buyer customer of Seller;

**2.3.4.11**    any account payable or other indebtedness owed by Seller (other than Assumed Liabilities);

**2.3.4.12**    any claim alleging loss, injury or damage relating to Excluded Assets; and

**2.3.4.13**    any claim relating to assets owned by non-Buyer customers in the custody, possession or control of Seller.

## ARTICLE 3
## PURCHASE PRICE

**3.1**    <u>Purchase Price</u>. Subject to the terms and conditions contained herein, Buyer shall pay Seller at Closing the following purchase price (the "<u>Purchase Price</u>") for the Purchased Assets:

**3.1.1**    $1,000,000 (one million Dollars) in cash, which Seller shall pay at Closing, as follows:

**3.1.1.1**    $142,500 (one hundred forty two thousand five hundred Dollars) plus accrued interest to the date of payment, to Fort Ashford Funds, LLC in full satisfaction and release of its pre-petition secured loan to Seller under its loan documents with Seller, and in full release of those Liens it holds securing such pre-petition loan to Seller;

**3.1.1.2**    All amounts loaned by Fort Ashford Funding, LLC to any or each of the respective Chapter 11 Debtors pursuant to a DIP Loan Facility approved by the United States Bankruptcy Court, outstanding at the date of Closing, plus accrued interest through the date of payment, to Fort Ashford Funding, LLC in full satisfaction and release of all claims it holds against Seller arising from such DIP Loan Facility;

**3.1.1.3**    The balance of the Purchase Price to the Debtors or as otherwise directed by the Bankruptcy Court; and

**3.1.2**    Buyer Cure Cost as provided in Sections 2.3.2.

**3.1.3** Buyer and Seller believe that certain leases of Equipment are Capital Leases and that certain other leases of Equipment are true leases subject to assumption and assignment under Sections 363 and 365 of the Bankruptcy Code, as listed on *Schedule 2.1.1(B)*, and Buyer presently intends to have Seller assume and assign the true leases as shown on *Schedule 2.1.2*. If the Bankruptcy Court should determine that the leases listed on *Schedule 2.1.2* are not true leases, but rather Capital Leases and that Seller. therefore owns the Equipment subject to such Capital Leases, then such Capital Leases shall be paid in full by Seller at Closing from the Purchase Price.

**3.2   Purchase Price Deposit.** Buyer has escrowed with the Escrow Agent, a refundable cash deposit (the "Deposit") of $100,000.00 against the Purchase Price The Deposit shall be fully refunded and paid to Buyer by the Escrow Agent if and when any of the following occurs: (i) the Bankruptcy Court does not enter the Sale Procedures Order in a form and manner acceptable to Buyer; (ii) the Bankruptcy Court does not enter the Sale Order in a form and manner acceptable to Buyer; or (iii) Closing does not occur on or before September 30, 2010, through no fault of Buyer. Upon entry of the final Sale Order, the Deposit shall automatically become non-refundable to Buyer unless Closing does not occur on or before September 30, 2010 through no fault of Buyer, in which event the Deposit shall be refunded to Buyer by the Escrow Agent.

**3.3   Payment of Purchase Price at Closing.** Buyer shall pay the Purchase Price to Seller at Closing by wire transfer to a bank account designated in writing by Seller prior to the Closing Date. If Escrow Agent pays Seller the Deposit at Closing, the amount of the Deposit will be credited against the Purchase Price to reduce Buyer's wire transfer to Seller. If Escrow Agent does not pay Seller the Deposit at Closing, Buyer will wire transfer to Seller the full amount of the Purchase Price and thereupon be entitled to a return of the Deposit.

**3.4   Allocation of Purchase Price.** Prior to Closing, Seller and Buyer shall agree on how the Purchase Price, as adjusted, is to be allocated among the Purchased Assets, tangible and intangible, for Tax purposes (the "Allocation"). Seller and Buyer agree to report the sale and purchase of the Purchased Assets for federal, state, municipal, local and foreign Tax purposes in accordance with the Allocation and not to take any position inconsistent with the Allocation on any of their respective Tax returns, reports, information returns or similar documents required to be filed with any governmental authority (including without limitation IRS Form 8594).

**ARTICLE 4**
**ASSETS OWNED BY CUSTOMERS OF SELLER**

**4.1** Buyer shall not acquire any right, title or interest in or to any asset owned by a non-Buyer customer of Seller. Custody, possession or control of such assets shall remain with Seller after Closing until returned to the customer owner, and shall not be transferred to or shared with Buyer in any way or to any degree. Buyer shall have no responsibility, liability or obligation of any kind or nature whatsoever relating to any

asset owned by a non-Buyer customer, including without limitation any responsibility, liability or obligation to maintain, preserve or protect such asset.

**4.2** Promptly following the execution of this Agreement, Seller shall give written notice to each non-Buyer customer of Seller who has allowed Seller to store, use or maintain equipment or other assets in the Office/Warehouse, Plant or other location where Buyer conducts its Business, as listed on *Schedule 2.2.3*, that Seller has entered into this Agreement and that said non-Buyer customer is free to remove its equipment or other assets from Seller's Office/Warehouse, Plant or other location where Buyer conducts its Business. Unless a non-Buyer customer of Seller instructs Seller and Buyer in writing to continue to store, use or maintain equipment or other assets in the Office/Warehouse, Plant or other location where Buyer conducts its Business following the Closing, Buyer shall cooperate with Seller and any non-Buyer customers in a commercially reasonable manner to facilitate the return of all assets owned by a non-Buyer customer of Seller and located in the Office/Warehouse, Plant or other location where Buyer conducts its business on the Closing Date. If a non-Buyer customer does not instruct Seller and Buyer in writing that Buyer may continue to use or maintain non-Buyer customer equipment or other assets following the Closing, then within sixty (60) days after Closing Seller will cause said assets to be physically removed from the Office/Warehouse, Plant or other location where Buyer conducts its business, and during the period prior to such removal Seller shall maintain adequate insurance to cover any losses that may be incurred with respect to such assets.

.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

**5.1** <u>Representations and Warranties of Seller</u>.

**5.1.1** nCoat, Inc., nTech, Inc., MCC, Inc., d/b/a Jet Hot, and High Performance Coatings, Inc. are each a duly organized corporation, validly existing and in good standing under the laws of its state of incorporation, and has the requisite power and authority to carry on its Business, as now being conducted. Seller has no subsidiary or affiliate other than nCoat Automotive Group, Inc..

**5.1.2** Following receipt of Bankruptcy Court Approval, Seller will have the requisite power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement, and the execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated by this Agreement have been (or will have been prior to Closing) duly authorized by all necessary action on the part of Seller's governing bodies. This Agreement has been duly executed and delivered by Seller and, assuming due execution and delivery by Buyer and receipt of Bankruptcy Court Approval, constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

**5.1.3** Seller has good and marketable title to all of the Purchased Assets, which Seller assets constitute all of the assets (i) used by Seller in its production lines or (ii) necessary to the operation of its Business, free and clear of Liens, other than:

**5.1.3.1** Liens for Taxes not yet due and payable; and

**5.1.3.2** Liens described on *Schedule 5.1.3.2*, all of which will be terminated and released, transferred to proceeds pursuant to Section 363 of the Bankruptcy Code or otherwise legally removed at or prior to Closing.

**5.1.4** Seller certifies except as previously disclosed in writing to Buyer, each of such Assigned Contracts and Leases is valid, binding and enforceable in accordance with its terms and is in full force and effect.

**5.1.5** Seller certifies except as disclosed in *Schedule 5.1.5*, other than the Chapter 11 Cases and proceedings, there are no claims, actions, suits, arbitration proceedings, inquiries, hearings, injunctions, investigations or other legal actions ("Actions") pending, or to the best knowledge of Seller, threatened, against Seller, its operations or the Business; to the best of Seller's knowledge, no Actions have been brought within the last two years against Seller or the Business, or affecting the Purchased Assets, or relating to Seller's ownership, use or operation of the Purchased Assets; and, to the best of Seller's knowledge, there are no facts or circumstances that could serve as the basis for any Action against Seller involving the Business or the Purchased Assets, or, by virtue of the execution, delivery and performance of this Agreement, against Buyer.

**5.1.6** Seller certifies except as previously disclosed in writing to Buyer, Seller is not in violation of any of the Permits and has paid all fees owed in connection with the Permits, and no proceedings are pending or, to the best knowledge of Seller, threatened, to revoke or limit any Permit. All of the Permits will be effectively assigned and transferred to Buyer at the Closing to the extent permitted by law.

**5.1.7** With respect to employment matters:

**5.1.7.1** no employees of Seller who work in the Business are or have been represented by a union or other labor organization or covered by any collective bargaining agreement, and to the best knowledge of Seller, no union is attempting to organize any such employees;

**5.1.7.2** there is no labor strike, dispute, slowdown, stoppage or similar labor difficulty pending or, to the best knowledge of Seller, threatened against or affecting Seller or the Business, nor have there been any such events pending or threatened; and

**5.1.7.3** no representations have been made by Seller or its

employees or agents to employees of Seller with respect to Buyer's intentions to employ, or not to employ, Seller's employees or with respect to the conditions of any such employment.

**5.1.8** With respect to environmental matters, except as disclosed on *Schedule 5.1.8*:

**5.1.8.1** Seller has complied with all Environmental Laws.

**5.1.8.2** No notice, notification, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending or threatened, by any governmental or other potential claimant with respect to (A) any alleged violation by Seller of any Environmental Law, or any liability thereunder, (B) any alleged failure by Seller to have any Environmental Permit, or (C) Seller's use, generation, treatment, storage, recycling, release, transportation or disposal of any Hazardous Substance.

**5.1.8.3** During the Seller's use, ownership or lease of any property now or previously owned, used or leased, by Seller there have been: (A) no urea formaldehyde or polychlorinated biphenyls present; (B) no asbestos or asbestos-containing materials present; (C) no underground storage tanks or related piping for Hazardous Substances, active or abandoned present and (D) no Hazardous Substance, Released at, on or under any such property, in a reportable or threshold planning quantity, where such a quantity has been established by any Environmental Law.

**5.1.8.4** Seller has not transported or arranged for the transportation (directly or indirectly) of any Hazardous Substance to any location which is (a) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or on any similar state list of sites requiring investigation or clean-up or (b) the subject of federal, state or local enforcement actions or other investigations which may lead to claims against Seller for any Environmental Liabilities including, without limitation, clean-up costs, remedial work, damages to natural resources or for personal injury claims, and claims under CERCLA.

**5.1.8.5** Seller certifies no oral or written notification of a Release of a Hazardous Substance has been filed by or on behalf of Seller and no property now or previously owned or leased by Seller is listed or proposed for listing, on the National Priorities List promulgated pursuant to CERCLA or on any similar state list of sites requiring investigation or clean-up.

**5.1.8.6** No notice, Lien or other restriction relating to the presence of Hazardous Substances or otherwise arising under and Environmental Law has been placed on any property or facility now or, to the best of Seller's knowledge, previously owned or leased by Seller, and no governmental actions have been taken or are in process that could subject any such property or facility to such a notice, Lien or other restriction. Seller is not required to place any such notice, Lien or other restriction relating to the

presence of Hazardous Substances or otherwise arising under any Environmental Law at any property used in connection with the operation of the Business or in any deed to such property.

5.1.8.7     There have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or for Seller, or which are or were in the Seller's possession, in relation to any property or facility now or previously owned or leased by Seller, which have not been delivered to Buyer.

5.1.8.8     Except as noted on *Schedule 5.1.8*, Seller has applied for and received all Environmental Permits required in connection with its Business. *Schedule 5.1.8* sets forth a list of all such Environmental Permits, each of which is in full force and effect, except as otherwise noted therein. No suspension or cancellation is threatened and there is no basis for believing that any such Environmental Permit will not be renewable upon expiration. To the extent permitted by law, each such Environmental Permit will continue to be in full force and effect immediately following Closing in accordance with the terms thereof as in effect immediately prior to Closing, and the consummation of the transactions contemplated herein will not conflict with, result in a violation or breach of or constitute a default under (or would result in a violation, breach or default with the giving of notice or the passage of time or both) any such Environmental Permit.

5.1.8.9     Except as noted on *Schedule 5.1.8.9*, Seller has not contracted, or otherwise agreed, to indemnify any person, in whole or in part, with respect to any liability, claim, costs, fees, or demand, known or unknown, arising under, or related to, any Environmental Law. Except as noted on *Schedule 5.1.8.9*, Seller has not contractually agreed to assume any liability, costs, expenses, claims or fees arising under any Environmental Law, nor is it obligated under any agreement to undertake any remediation, removal, response or site assessment activities at any site, property or location.

5.1.9     Seller certifies the *Schedules* attached to this Agreement are true and correct and fully and accurately reflect Seller's assets and liabilities relating to the Business, the assets owned by Seller's customers that are in Seller's custody, possession or control, and all Liens, pending Actions, and required environmental disclosures.

5.2     **Representations and Warranties of Buyer.**

5.2.1     Buyer is a duly organized, validly existing limited liability corporation in good standing under the laws of the State of California, and will be licensed to do business in the State of North Carolina, Oklahoma and Arizona as of the Closing Date, and has the requisite power and authority to carry on the business contemplated by this Agreement; and

5.2.2     Buyer has the requisite power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement. The execution and

delivery of this Agreement by Buyer and the consummation of the transactions contemplated by this Agreement have been (or will have been prior to the Closing Date) duly authorized by all necessary action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and, assuming due execution and delivery by Seller and receipt of Bankruptcy Court Approval, constitutes a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**5.2.3** Buyer has the requisite power and authority to consummate the transactions contemplated by this Agreement and has taken all necessary corporate action to authorize its performance of this Agreement. Assuming execution and delivery by the parties and receipt of Bankruptcy Court Approval, this Agreement will constitute a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**5.2.4** The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby will not conflict with or result in the violation of the provisions of the Articles of Organization or Operating Agreement of Buyer.

## ARTICLE 6
## COVENANTS OF SELLER PENDING CLOSING

**6.1** <u>Access, Inspections and Confidentiality.</u>

**6.1.1** Provided that there be no significant disruption of the Business operations, Seller shall permit Buyer and Buyer's directors, officers, employees, representatives, agents and advisors to have full access at all reasonable times to and to conduct reasonable inspections of any or all of the Purchased Assets and to any and all information, data and documentation pertaining to the conduct of the Business or the ownership or operation of any of the Purchased Assets, and to cause Seller's directors, officers, employees, representatives, agents and advisors to furnish to Buyer and Buyer's officers, employees, representatives, agents and advisors such data and documentation relevant to the conduct of Business or the ownership or operation any of the Purchased Assets as Buyer may reasonably request.

**6.1.2** Seller shall make available to Buyer true and complete copies of all Assigned Contracts and Leases, including any and all amendments and other modifications thereto. All information provided to the Buyer pursuant to this <u>Section 6.1</u>, shall be considered confidential (the "Confidential Information") and the Buyer agrees that the Confidential Information will be used solely for the purpose of consummating this Agreement and that all of the Confidential Information will be kept confidential; provided that any such information may be disclosed only to the limited group of the Buyer's officers, directors, employees, agents, and outside advisors, who are actually engaged in and need to know the Confidential Information for the purpose of

consummating this Agreement, who have been informed of the confidential nature of the Confidential Information, and who have been advised by and agree with Buyer that such information is to be kept confidential and shall not be used for any purpose other than consummating of this Agreement.

**6.2** **Preserving Value of Purchased Assets and Business**. Pending Closing, Seller shall use its best efforts to maintain and operate the Business in the ordinary course of business within the meaning of Section 363 of the Bankruptcy Code, shall not sell or otherwise dispose of assets or incur liabilities or obligations relating to the Business or the Purchased Assets except in the ordinary course of business within the meaning of Section 363 of the Bankruptcy Code, shall keep in good operating condition, reasonable wear and tear excepted, all owned and leased machinery and equipment used in the Business. Seller shall use its best efforts to (i) pay all post-petition administrative costs of doing business when due, (ii) pay employees and payroll Taxes in accordance with the Bankruptcy Code and the Bankruptcy Court's orders, (iii) not terminate the employment of any person identified on *Schedule 9.5.1* prior to Closing (y) without Buyer's consent, which shall not be unreasonably withheld, or (z) without Court approval, and (iv) comply with all legal and regulatory requirements relating to the Business.

**6.3** **Real Property Leases**. Pending Closing, Seller shall not reject or terminate, or permit termination or rejection, of its real property leases for the Office/Plant and Warehouse.

**6.4** **Chapter 11**. Seller shall undertake the following:

**6.4.1** On or before August 16, 2010, Seller shall file with the Bankruptcy Court a voluntary petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code.

**6.4.2** Contemporaneous with the filing of the Petition, or within two business days thereafter, Seller shall file a motion for entry of an order by the Bankruptcy Court approving this Agreement and the sale of the Purchased Assets to Buyer in accordance with the terms and conditions hereof, said order (the "Sale Order") to be substantially in the form annexed hereto as *Exhibit 2* (provided that any material change in the form of the order must be approved by Buyer) and to provide, among other things, that: (i) Seller is authorized to assume and assign to Buyer under Section 365 of the Bankruptcy Code all of the Assigned Contracts and Leases described on *Schedule 2.1.2*, (ii) Buyer is a "good faith" buyer, within the meaning of Section 363(m) of the Bankruptcy Code, (iii) Buyer is a bona fide purchaser for value, (iv) the Purchase Price is fair and reasonable, (v) appropriate notice has been provided to all non-debtor parties to the Assigned Contracts and Leases, all customers of Seller, and all other persons or entities who hold or assert Liens in, to or against the Purchased Assets, (vi) the Purchased Assets are conveyed to Buyer free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, and (vii) the 14-day stay under Bankruptcy Rule 6004(h) does not apply.

**6.4.3** Seller shall use its best efforts to obtain a hearing (the "Sale Hearing") on

the motion for the Sale Order and to obtain entry of the Sale Order at the earliest practicable date so that Closing may occur on or before September 30, 2010.

**6.4.4** Contemporaneous with the filing of the Petition, Seller shall file a motion for entry of the Sales Procedures Order substantially in the form annexed hereto as *Exhibit 3* (provided that any material change in the form of the order must be approved by Buyer), including, but not limited to, provisions for a break-up fee of $150,000, overbid protection requiring a minimum initial raised bid of $250,000 calculated over and above the required break-up fee, a deadline for submission of competing bids, requirements that to qualify for consideration each competing bid must include a $350,000 cash deposit and must not be subject to any financing or other condition except for those set forth herein, notice and service requirements, and a date set for the Sale Hearing. Seller shall use its best efforts to have the motion for entry of the Sale Procedures Order heard by the Bankruptcy Court on an emergency or expedited basis and the Sale Procedures Order entered by the Bankruptcy Court at the earliest possible date.

**6.4.5** Seller's motions for entry of the Sale Order, and the Sale Procedures Order shall be in form and substance reasonably satisfactory to Buyer.

**6.4.7** In the event that an appeal is taken, a stay pending appeal is requested or reconsideration is sought, from the Sale Order, or the Sale Procedures Order, Seller will immediately notify Buyer thereof and provide Buyer with a copy of all pleadings, orders, notices and other documents relating thereto.

**6.4.8** Seller shall give notice of all motions, notices and orders relating to this Agreement, including without limitation, the motions for entry of the Sale Procedures Order, and Sale Order, the notices of hearing, and the orders themselves, to all persons legally entitled to notice thereof under the Bankruptcy Code and Bankruptcy Rules.

**6.5** **Buyer On-Site Consultant/Employee.** Pending Closing, Seller shall permit a consultant or employee of Buyer to be present on-site at the Office/Plant to observe Seller's Business and conduct due diligence.

**6.6** **Removal of Hazardous Materials.** Prior to Closing, Seller shall remove from the premises of the Office/Plant and Warehouse all Hazardous Waste, including without limitation, acid and SDF Booth Filters, acid, solvent/oil and caustic waste and sludge, and further including without limitation, degreasing tanks and other containers used to hold or store such Hazardous Materials, said removal to be in compliance with all applicable federal, state and local laws and regulations.

### ARTICLE 7
### CONDITIONS PRECEDENT TO CLOSING

**7.1** **Of Buyer.** All of the obligations of Buyer under Articles 2, 3 and 5 of this

Agreement are subject to the fulfillment prior to or at Closing of each of the following conditions, any of which Buyer may waive in its sole discretion:

**7.1.1** Seller shall have performed and complied in all material respects with all agreements, commitments, covenants and other obligations required by this Agreement to be performed or complied with by Seller prior to or at Closing;

**7.1.2** Seller shall have delivered to Buyer all of the deliverables referenced in Section 9.2;

**7.1.3** Seller shall have assigned to Buyer all Permits that are assignable or transferable (i) without cost or (ii) without the legally required consent of any third party, and that are legally required by law to operate the Business;

**7.1.4** Seller shall have filed with the Bankruptcy Court a Petition on or before August 16, 2010, (the "Petition Date");

**7.1.5** On or within two business days after the Petition Date, Seller shall have filed with the Bankruptcy Court motions for entry of the Sale Order, and the Sale Procedures Order;

**7.1.6** The Bankruptcy Court shall have timely entered the Sale Procedures Order substantially in the form annexed hereto as *Exhibit 3* (provided that any material change in the form of the order must be approved by Buyer);

**7.1.7** Seller shall have used its best efforts to obtain entry of the Sale Order so that Closing can reasonably occur on or before September 30, 2010;

**7.1.8** From the time of the signing of this Agreement to the Closing Date, there shall have been no Material Adverse Change in the condition of the Purchased Assets, or the Assumed Liabilities; and

**7.1.9** Seller shall have removed from the premises of the Office/Plant and Warehouse all Hazardous Waste, including without limitation, acid and SDF Booth Filters, acid, solvent/oil and caustic waste and sludge, including without limitation, degreasing tanks and other containers used to hold or store Hazardous Materials, said removal to be in compliance with all applicable federal, state and local laws and regulations.

**7.2**    **Of Seller**. All of the obligations of Seller under Articles 2, 3, 4 and 5 of this Agreement are subject to the fulfillment prior to or at Closing of each of the following conditions, any of which Seller may waive in its sole discretion:

**7.2.1** Buyer shall have performed and complied in all material respects with all agreements, commitments, covenants and other obligations required by this Agreement to be performed or complied with by Buyer prior to or at the Closing; and

**7.2.2** Buyer shall have delivered to Seller all of the deliverables referenced in Section 9.3.

**7.3** **Of Each Party**. The respective obligations of each party under Articles 2, 3, 4 and 5 of this Agreement are subject to the fulfillment prior to or at Closing of each of the following conditions:

**7.3.1** entry by the Bankruptcy Court of the Sale Order substantially in the form annexed hereto as *Exhibit 2* (provided that any material change in the form of the order must be approved by Buyer);

**7.3.2** the Sale Order is effective and has not been restrained, enjoined or stayed.

## ARTICLE 8
## OTHER AGREEMENTS OF THE PARTIES

**8.1** **Reasonable Efforts/Further Assurances**. From the date hereof until Closing and thereafter, upon the terms and subject to the conditions of this Agreement, each party hereto shall use all reasonable good faith efforts to take or cause to be taken all actions and to do or cause to be done all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated by this Agreement, including without limitation obtaining any necessary consent, approval, authorization or waiver from the Bankruptcy Court. Upon the reasonable request of the other party, each party agrees to take any and all actions, including without limitation the execution of certificates or instruments, necessary or appropriate to give effect to the terms and conditions set forth in this Agreement.

**8.2** **Publicity**. Seller shall not issue any press release, written public statement or announcement relating to this Agreement or the transactions contemplated by this Agreement without the written prior approval of Buyer in each instance, except to the extent such disclosure is required as part of the approved Sale Procedures or by applicable law (in which case Seller shall use all reasonable efforts to give Buyer prior notice thereof).

**8.3** **Expenses**. Except as otherwise provided in this Agreement and in the Sale Procedures Order, Seller and Buyer shall each bear its respective expenses incurred in connection with the negotiation, execution, delivery or implementation of this Agreement or the transactions contemplated by this Agreement, including without limitation all accounting, legal, financial advisory and other expenses. Each party hereby acknowledges that no broker, investment banker or other person is entitled to any broker's, finder's or other similar fee or commission payable by such party in connection with the transactions contemplated by this Agreement.

**8.4** **Relationship of the Parties**. The relationship between Seller and Buyer

established by this Agreement is solely that of vendor and vendee and nothing contained herein shall be deemed to create a joint venture or other fiduciary relationship between Seller and Buyer. Neither Seller nor Buyer, nor their respective officers, directors, managers, employees, representatives, or agents, shall be deemed to be agent or servant of the other party nor have the right or authority to enter into any contract, agreement, commitment or other obligation in the name of or on behalf of the other party or otherwise purport to bind the other party in any manner.

**8.5** **Mutual Releases**. Seller, as debtor and debtor-in-possession in its Chapter 11 Cases and on behalf of itself and its bankruptcy estate, officers, directors, employees, successors and assigns shall hereby, effective at Closing, release, remise, acquit, and forever discharge Buyer and Buyer and its affiliates, officers, directors, employees, successors, and assigns from any and all damages, causes, actions, guaranties, demands, rights, costs, losses, expenses and other claims whatsoever which Seller now has or may hereafter have, including, but not limited to, those in any way relating to the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities, the Business, or Seller's employees. Buyer on behalf of itself and its officers, directors, employees, parent, successors and assigns shall hereby, effective at Closing, release, remise, acquit, and forever discharge Seller and its bankruptcy estate, officers, directors, employees, successors and assigns from any and all damages, causes, actions, guaranties, demands, rights, costs, losses, expenses and other claims whatsoever which Buyer now has or may hereafter have, including, but not limited to, those in any way relating to the Purchased Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities, the Business, or Seller's employees; provided, however, that nothing herein shall be construed to release or relieve Seller from its obligations to perform this Agreement or from damage or equitable claims for material breach of this Agreement.

**8.6** **Maintenance and Furnishing of Information**.

    **8.6.1** Seller and Buyer each agree that, for a period of six (6) years after the Closing Date (or such longer period as may be required by applicable Law), neither shall destroy or otherwise render unavailable any books, records, documents, data or other information relating principally to the conduct of the Business or the ownership or operation of the Purchased Assets prior to the Closing Date (the "Information"), without first offering the other party in writing the opportunity to obtain possession thereof at such other party's sole expense.

    **8.6.2** Seller and Buyer each agree to maintain easy and ready access and to make available to the other party, at reasonable times after reasonable request therefore and at the requesting party's sole expense, any information for the purpose of (i) preparing for, prosecuting or defending any suit, action, litigation or administration, arbitration or other proceeding or investigation (other than one by or against the non-requesting party) by or against the requesting party, including but not limited to claims objections and bankruptcy recoveries in Seller's bankruptcy case, (ii) preparing and filing any Tax return or election relating to the Purchased Assets or the Assumed Liabilities and/or preparing for or defending any examination of Tax or Tax return by any

governmental authority, or (iii) any other legitimate purpose ("Authorized Purpose"). The party requesting such information shall reimburse the party providing such Information for out-of-pocket costs and expenses incurred by the party providing such Information. Notwithstanding any provision herein to the contrary, Buyer shall provide the access and make available to Seller, as Debtor, Debtor-in-possession, or Reorganized Debtor, such information covered by the terms of this Section 8.6.2, without expense to Seller except for document copying charges, for a period of one year from the Closing Date.

8.6.3   Seller and Buyer each agree to make available to the other party, from time to time as reasonably required, employees, consultants, accountants and attorneys of such party for any Authorized Purpose.   The party requesting assistance under this Section 8.6 shall reimburse the party providing such assistance for all out-of-pocket costs and expenses incurred by such party.

8.6.4   The access to files, books and records contemplated by this Section 8.6.4 shall be during normal business hours and upon reasonable written request, shall be subject to such reasonable limitations as the party having custody or control thereof may impose to preserve the confidentiality of information contained therein or to delete competitively sensitive information, shall not extend to any material subject to a claim of privilege unless expressly waived by the party entitled to claim the same.

**8.7   Assignability of Certain Contracts.**   To the extent that the assignment to the Buyer of any Assigned Contracts and Leases pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Assigned Contracts and Leases, as applicable, or any right or interest therein unless and until such consent is obtained; provided, however, that the Seller will use its best efforts, before the Closing, to obtain all such consents

## ARTICLE 9
## CLOSING

**9.1   Closing Date.**   The sale and purchase of the Purchased Assets, including assumption and assignment of the Assigned Contracts and Leases and assumption of the Assumed Liabilities, shall be consummated at a closing (the "Closing") to be held at 10:00 A.M. Eastern Standard Time, on the closing date (the "Closing Date") at the offices of N&C, 3700 Glenwood Avenue, Suite 500, Raleigh, North Carolina, provided that conditions precedent specified in Article 7 have been satisfied or waived. The Closing Date shall be on or before September 30, 2010. If the Closing Date does not occur on or before September 30, 2010, then the Buyer shall have the right to terminate this Agreement in accordance with Section 11.3.

9.2   Deliveries of Seller.   At Closing, Seller shall d-li

Buyer, in form and substance satisfactory to Buyer, the following:

**9.2.1**  physical control of all of the Purchased Assets;

**9.2.2**  duly executed originals of such bills of sale, deeds, assignments and other instruments of sale, conveyance, transfer, assumption and assignment as are necessary or appropriate to sell, convey, transfer, assume and assign to Buyer all of Seller's right, title and interest in and to all of the Purchased Assets in form and substance satisfactory to Buyer;

**9.2.3**  a certified statement by Seller, dated as of the Closing Date, that:

**9.2.3.1**  all conditions specified in Sections 7.1 and 7.3 have been fulfilled or that the satisfaction of any of such conditions has been waived; and

**9.2.3.2**  all consents, approvals, authorizations, waivers and other actions that are required in connection with the execution, delivery and performance of this Agreement by Seller and the consummation by Seller of all transactions and other commitments and obligations contemplated by this Agreement have been obtained or taken; and

**9.2.3.3**  all Future Payment Obligations regarding the Assigned Contracts and Leases described on *Schedule 2.1.2* have been paid and Seller is authorized by order of the Bankruptcy Court to assume and assign to Buyer at Closing all such Assigned Contracts and Leases;

**9.2.4**  amended *Schedule 2.1.1(A), Schedule 2.1.1(B), Schedule 2.1.3, Schedule 2.1.4,* and *Schedule 2.1.6,* as necessary, to make each list of Purchased Assets true and correct as of Closing;

**9.2.5**  an agreed statement of the Loan Balance;

**9.2.6**  an order entered by the Bankruptcy Court approving Seller's rejection of its real property leaseseffective at Closing, except for those leases specifically identified by Buyer for assumption and assignment; and

**9.2.7**  a filed stamped copy of the Sale Order evidencing Bankruptcy Court Approval.

**9.3**  **Deliveries of Buyer**.  At the Closing, Buyer shall deliver or cause to be delivered to Seller, in form and substance satisfactory to Seller, the following:

**9.3.1**  the Purchase Price (including the Deposit) as provided in Section 3.3;

**9.3.2**  a certified statement by Buyer, dated as of the Closing Date, that:

**9.3.2.1** all conditions specified in Sections 7.2 and 7.3 have been fulfilled or that the satisfaction of any of such conditions has been waived; and

**9.3.2.2** all consents, approvals, authorizations, waivers and other actions have been obtained or taken by Buyer which are required in connection with the execution, delivery and performance of this Agreement and the consummation of all transactions and other commitments and obligations contemplated by this Agreement;

**9.3.3** amended *Schedule 2.1.2*, as necessary, to make the list of Assigned Contracts and Leases true and correct as of Closing;

**9.3.4** amended *Schedule 9.5.1*, as necessary, to make the list of Seller's employees to whom Seller intends to offer at-will employment true and correct as of Closing; and

**9.3.5** an agreed statement of the Loan Balance.

**9.4** **Tax Matters.** Seller and Buyer shall respectively pay taxes, fees, levies, duties, charges or similar assessments (including without limitation interest, penalties and additions) imposed by or payable to any governmental authority (each a "Tax") as follows:

**9.4.1** Seller shall pay all transfer, real property transfer, documentary stamp and other similar Taxes, if any, imposed upon them with respect to the sale of any of the Purchased Assets and all recording, filing and other fees and costs with respect to the sale and purchase of any of the Purchased Assets. To the extent that Seller contemplates incorporating the terms of this Agreement in to a Chapter 11 Plan of Liquidation, it believes that the transfers contemplated by this Agreement should be subject to the special tax provisions of 11 U.S.C. 1146 (b);

**9.4.2** Seller shall pay all sales and use Taxes, if any, imposed upon it with respect to the sale to Buyer of any of the Purchased Assets; and

**9.4.3** Buyer shall bear responsibility for all income, real property and other Taxes associated with the Purchased Assets or the Business accruing after the Closing Date.

**9.5** **Employees.**

**9.5.1** Buyer anticipates offering at-will employment to Seller's current employees, said employment to commence immediately following Closing. Buyer shall have the right, in its sole discretion, to amend, alter or modify the composition of those employees to which it anticipates offering at-will employment at any time prior to Closing. Buyer and Seller agree that Buyer shall be under no obligation to offer employment to any employee involved in the Business, and the terms and provisions of any such offer of employment shall be in the sole discretion of Buyer Buyer's offers of

employment to the persons may be for an initial probationary period. Buyer shall not have any liability for or obligation to any employee of Seller who does not timely accept Buyer's offer of employment.

9.5.2 Unless prohibited by law, Seller shall make available to Buyer all personnel records, including without limitation names, Social Security numbers, dates of hire by Seller, dates of birth, number of hours worked each calendar year, and salary histories, for all of Seller's employees in connection with the Business. Seller and Buyer shall also cooperate, both before and after the Closing Date, in exchanging information, including pertinent employment records, benefit information, salary and compensation records, financial statements and other data, and in taking other action respecting the interests of the persons identified on *Schedule 9.5.1* who are offered and accept employment with Buyer (the "Hired Employees"). All of the foregoing information shall be deemed Confidential Information. Seller shall terminate its employment of Hired Employees on or before the effective date of their employment by Buyer.

9.5.3 In no event shall Buyer have any liability or responsibility for any obligations owed by Seller to its employees except as specifically provided herein.

9.6 **Proration of Certain Items.** With respect to certain expenses incurred in the operation of the Business, the following prorations shall be made:

9.6.1 **Operating Expenses.** Subject to the specific provisions of this Section and Sections 2.3.2, 2.3.3 and 2.3.4 above, Seller shall be responsible for all costs and expenses attributable to the operation of the Business or the ownership of the Purchased Assets up to and including the Closing Date, and Buyer shall become responsible for all costs and expenses attributable to the operation of the Business or ownership of the Purchased Assets after the Closing Date.

9.6.2 **Assigned Contracts and Leases.** The next payments due after the Closing Date with respect to all Assigned Contracts and Leases shall be apportioned between Seller and Buyer based on the relative time in such period before and after the Closing Date.

9.6.3 **Taxes.** Ad valorem property Taxes shall be apportioned at Closing as of the Closing Date, based on current Tax bills if available and based upon a calendar year (as opposed to a fiscal year) and, if not available, based on the most recent Tax assessments and Tax rates available.

9.6.4 **Utilities.** Utilities, water and sewer charges shall be apportioned between Seller and Buyer based on the number of operating days occurring before and after the Closing Date during the billing period for each such charge.

9.6.5 **Payments.** Appropriate cash payments by Seller or Buyer, as the case may require, shall be made from time to time, as soon as practicable after the facts giving rise to the obligation for such payments are known, to give effect to the prorations

provided in this Section 9.6.

**9.7** <u>**Right, Title and Interest in and to Buyer Purchased Assets**</u>. At Closing, Buyer will take all right, title, and interest in and to all Equipment, all Inventory and all other Purchased Assets used by Seller in its Business.

# ARTICLE 10
## POST-CLOSING OBLIGATIONS

**10.1** <u>**Receivables**</u>. From and after Closing, Seller shall have no collection or other responsibility of any nature or kind with respect to Seller's Receivables, except as follows:

**10.1.1** Seller and any duly appointed official committee (the "<u>Committee</u>") in the Chapter 11 Cases shall notify Buyer of any monies received by Seller post-Closing in payment of the Receivables and shall promptly remit same to Buyer possession; and

*Seller* *HL*

**10.1.2** From and after Closing, Buyer will be using the Purchased Assets to conduct business and generate its own accounts receivable ("<u>Buyer's Receivables</u>"). Seller shall notify Buyer of any monies received by Seller post-Closing in payment of Buyer's Receivables and shall promptly remit same to Buyer.

# ARTICLE 11
## TERMINATION

**11.1** <u>**Termination By Buyer**</u>. This Agreement and the transactions contemplated hereby may be terminated by Buyer at any time prior to Closing, as follows:

**11.1.1** if Buyer is prepared to close and all conditions of Seller's obligations to close pursuant to Sections 7.2 and 7.3 have been satisfied and Seller fails to close in accordance with Article 9 or fails to satisfy the conditions under Section 7.1.1 through 7.1.5;

**11.1.2** if Seller fails to cure any material breach of this Agreement within ten (10) days after receiving written notice thereof from Buyer;

**11.1.3** if the Bankruptcy Court declines to enter the Sale Order;

**11.1.4** if the Bankruptcy Court declines to enter the Sale Procedures Order; or

**11.1.5** if, as of the Closing Date, there exists a Material Adverse Change.

**11.2** <u>**Termination By Seller**</u>. This Agreement and the transactions contemplated hereby may be terminated by Seller at any time prior to Closing, as follows:

**11.2.1** if Seller is prepared to close and all conditions to Buyer's obligations to close pursuant to Section 7.1 and 7.3 have been satisfied and Buyer either fails to close in accordance with Article 9 or fails to satisfy the conditions under Section 7.2;

**11.2.2** if Buyer fails to cure any material breach of this Agreement within ten (10) days after receiving written notice thereof from Seller; or

**11.2.3** if the Bankruptcy Court declines to enter the Sale Order or the Sale Procedures Order.

**11.3** <u>Notice of Termination</u>. Termination of this Agreement by either party hereto shall not become effective until written notice is provided to the other party specifying the particular grounds and subsection(s) of this Article 11 supporting termination.

**11.4** <u>Effect of Termination</u>. In the event this Agreement is terminated pursuant to this Article 11, the provisions of Sections 3.2, 6.1.2, 8.3, 11.6, 13.3 through 13,8, 13.14, and 13.15 shall survive any such termination along with any other provisions of this Agreement that expressly or by implication survive such termination.

**11.5** <u>Refund of Deposit</u>. Escrow Agent shall refund to Buyer the Deposit if this Agreement is terminated or terminates automatically pursuant to Section 11.1 or Section 11.2.3.

**ARTICLE 12**
**MISCELLANEOUS**

**12.1** <u>Bulk Sales Waiver</u>. Buyer and Seller hereby waive any compliance with applicable bulk sales transfer law. Except as related to the Assumed Liabilities, Seller represents and warrants that the creditors with respect to the post-petition conduct of the Business have been paid in full prior to the Closing Date, or as otherwise allowed in accordance with the provisions of the Bankruptcy Code.

**12.2** <u>Assignment</u>. Buyer may assign this Agreement, in whole or in part. Seller may not assign this Agreement, in whole or in part, without the prior written consent of the Buyer. Any attempted assignment not in accordance herewith shall be null and void and of no force or effect.

**12.3** <u>Waiver; Amendment</u>. No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon either party unless confirmed in writing. No waiver by either party of any term or provision of this Agreement or of any default hereunder shall affect such party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar. This Agreement may not be modified or amended except by a writing executed by both parties.

**12.4** <u>Interpretation</u>. This Agreement shall not be construed more strictly against either party hereto regardless of which party is responsible for its preparation, it being agreed that this Agreement was fully negotiated by both parties.

**12.5** <u>Headings</u>. The titles, captions and headings contained in this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect in any way the meaning or interpretation of this Agreement.

**12.6** <u>Reference with Agreement</u>. References in this Agreement to numbered or lettered Articles, Sections, subsections, items, *Exhibits*, and *Schedules* refer to Articles, Sections, subsections, items, *Exhibits*, and *Schedules* of this Agreement unless otherwise expressly stated. The words "herein," "hereof," "hereunder," "hereby," "this Agreement" and other similar references shall be construed to mean and include this Agreement and all *Exhibits* and *Schedules* to this Agreement, and all amendments to any of them unless the context clearly indicate or require otherwise.

**12.7** <u>Binding Effect</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, representatives, successors and permitted assigns.

**12.8** <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF NORTH CAROLINA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS.

**12.9** <u>Notices</u>. All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed, certified mail, postage prepaid as to each of the parties hereto or by facsimile transmission, receipt acknowledged, at the following respective addresses and facsimile numbers (or at such other address or facsimile number as to which any such party may have notified the other party pursuant to the terms hereof):

**12.10** <u>Counterparts; Fax Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy of other facsimile transmission of any signature shall be deemed an original and shall bind such party.

**12.11** <u>Entire Agreement</u>. This Agreement, together with all *Exhibits* and *Schedules* to this Agreement (all of which are incorporated herein by this reference), contains the entire agreement and understanding concerning the subject matter hereof between the parties and specifically supersedes any other agreement or understanding among the parties related to the subject matter hereof.

**12.12** <u>Severability</u>. If any provision of this Agreement shall be held by a court of

competent jurisdiction to be void, voidable, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and, accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, voidable, invalid or inoperative provision had not been contained herein.

**12.13  Time Is Of The Essence**.  Time is of the essence regarding the parties' performance and the Bankruptcy Court Approval and Closing of this Agreement.

**12.14  Resolution of Disputes**.

**12.14.1**    The Bankruptcy Court shall have exclusive jurisdiction to resolve any dispute between the parties arising out of or related to this Agreement. However, no party to this Agreement shall institute a proceeding in the Bankrutpcy Court to resolve a dispute between the parties arising out of or related to this Agreement before that party has sought to resolve the dispute through direct negotiation with the other party.  If the dispute is not resolved within five business days after a demand for direct negotiation, then either party may seek relief from the Bankruptcy Court.

**12.14.2**    All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 12.14 are pending.  The parties will take such action, if any, required to effectuate such tolling.

**12.14.3**    Each party hereto is required to continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement.

**12.15  No Third Party Beneficiaries**.  None of the provisions of this Agreement or any document contemplated hereby is intended to grant any right or benefit to any person or entity which is not a party to this Agreement, except that Seller acknowledges and agrees that Buyer is intended to be, and shall be treated as, a third-party beneficiary of this Agreement with respect to every provision herein that pertains to Buyer.

**IN WITNESS WHEREOF**, the undersigned have caused their respective duly authorized representatives to execute this Agreement as of the day and year first above written.

NCOAT, INC. ("Seller")

By: _____
       Name

       _____
       Title

**NTECH, INC. ("Seller")**

By: _____
     Name

     _____
     Title

**MCC, INC. ("Seller")**

By: _____
     Name

     _____
     Title

**HIGH PERFORMANCE COATINGS, INC. ("Seller")**

By: _____
     Name

     _____
     Title

**FORT ASHFORD FUNDS, LLC ("Buyer")**

By: _____
     Name

     Manager    8-13-10
     Title

## LIST OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| *Schedule 2.1.1(A)* | Equipment not subject to any lease |
| *Schedule 2.1.1(B)* | Equipment subject to Capital Leases |
| *Schedule 2.1.2* | Assigned Contracts and Leases |
| *Schedule 2.1.3* | Inventory |
| *Schedule 2.1.7* | Miscellaneous Assets |
| *Schedule 2.2.2* | Customer-owned assets in Seller's possession and identities of customers |
| *Schedule 5.1.3.2* | Liens on Purchased Assets to be terminated, released, transferred to proceeds or otherwise removed at or before Closing |
| *Schedule 5.1.5* | Actions |
| *Schedule 5.1.8* | Environmental disclosures |
| *Schedule 9.5.1* | Seller's current employees to whom Buyer anticipates offering employment |
| *Exhibit 1* | Form of Sale Order |
| *Exhibit 2* | Form of Sale Procedures Order |

*Schedule 2.1.1(A)*    Equipment not subject to any lease
HPC

| Equipment | Quantity |
|---|---|
| Auto Blaster | 1 |
| 5x5x6 Despatch Oven | 1 |
| 4 Zone IR | 1 |
| 1 Zone IR Preheat | 1 |
| Valve Machine - Vader II | 1 |
| Conveyor System - Unibilt | 1 |
| Misc Vibratory (Small) | 2 |
| Grease Monkey Ultrasonic washer | 1 |
| 50 HP Quincy Compressor | 1 |
| Hankison Dryer and Filter | 1 |
| 2 x 8 Gas Manifold for Acetylene with spark arrestors | 1 |
| Sand Blaster (Standard) 4 x 4 | 1 |
| Gema Powder Coat Machine | 1 |
| Pneumatic mixer | 5 |
| Cat Forklift | 1 |
| Pallet Jacks | 8 |
| 1994 Chev Diesel Dual wheel truck | 1 |
| 50 HP Gardner Denver Compressor | 1 |
| 240 Gallon Tank | 2 |
| Fischer Technology Thickness Tester | 2 |
| Gloss Meter | 1 |
| E Series Spray Gun Systems | 1 |
| Sand Blaster (Standard) 4 x 4 | 5 |
| Zero Blaster 3 x 4 | 1 |
| Tumble Blaster | 1 |
| Walk In Blaster | 1 |
| 4 Zone IR | 1 |
| Advanced Design Concepts Oven gas fired (10'x5'x7') | 1 |
| Despatch Oven gas fired (4'x4'x6') | 1 |
| Despatch Oven gas fired (5'x5'x5') | 1 |
| Conveyor System - Unibilt | 1 |
| Rotofinish Vibratory | 1 |
| Giant Finishing Vibratory | 1 |
| electro Debur Vibratory | 1 |
| Almco Vibratory 20' | 1 |
| | |

| | |
|---|---|
| Open Spray Booth 10' | 1 |
| Open Spray Booth 8' | 2 |
| Open Spray Booth 4' | 1 |
| Toyota Forklift | 1 |
| 2001 Ford F150 | 1 |
| 50 HP Quincy Compressor | 2 |
| Zeks Dryer Model 400NCAA40M | 1 |
| Gloss Meter | 1 |
| Fischer Technology Thickness Tester | 1 |
| Gema Powder Coat Machine | 1 |
| E Series Spray Gun Systems | 2 |
| Zero Blaster 3 x 4 | 1 |
| Grive / 350,000 BTU / 5 x 6.5 | 1 |
| Almco Vibratory 20' | 1 |
| Misc Vibes 4' | 2 |
| Open Spray Booth 10' | 1 |
| Open Spray Booth 8' | 1 |
| Daewood Forklift | 1 |
| Gema Powder Coat Machine | 1 |
| 1994 Dodge Pickup | 1 |

*Schedule 2.1.1(A)*     Equipment not subject to any lease
JHT

| Equipment | Quantity |
|---|---|
| Toyota Electric Pallet Jack | 1 |
| 400 Gal air tank | 1 |
| Pallet Scale | 1 |
| Powder Coat Machine | 1 |
| Port-a-cool swamp cooler | 1 |
| Empire Grit Blaster (Large) 5 x 5 | 1 |
| Misc Vibratory (Large) | 1 |
| Port-a-cool swamp cooler | 1 |
| Sand Blaster (Standard) 4 x 4 | 1 |
| Glass Bead Blaster 4 x 5 | 1 |
| Empire Grit Blaster (Large) 5 x 5 | 1 |
| Jensen / Line Oven / 1.5 Mil BTU | 1 |
| DeSpatch / Batch Oven / 350,000 BTU / 10 x 7 | 1 |
| Conveyor System, Pac-Line | 1 |
| Misc Vibes 4' need liner repair | 4 |
| Enclosed booth 11 x 12 | 2 |
| Pallet Jack | 2 |
| 50 HP Gardner Denver Compressor | 1 |
| Quincy AIFD dryer | 1 |
| E Series Spray Gun Systems | 2 |
| Office Furniture | 1 |
| Computers and Equipment | 5 |

***Schedule 2.1.1(A)***  Equipment not subject to any lease
NCO

| Equipment | Quantity |
|---|---|
| Office Furniture | 20 |
| Computers and Equipment | 40 |

*Schedule 2.1.1(A)*     Equipment not subject to any lease
NTC

| Equipment | Quantity |
|---|---|
| Extech Type K Thermometer - 421501 | 1 |
| Extech Type K Thermometer - 421501 | 1 |
| Extech Type K Thermometer - 421501 | 1 |
| Fluke 54II Thermocouple Thermometer | 1 |
| Fluke 54II Thermocouple Thermometer | 1 |
| Fluke 54II Thermocouple Thermometer | 1 |
| DigiSense Type K Thermometer | 1 |
| Jenco Model 710 thermocouple reader | 1 |
| Fluke 68 IR Thermometer | 1 |
| Extech Temperature Calibrator-42312 | 1 |
| Extech Temperature Calibrator-42312 | 1 |
| TC Welder | 1 |
| Megger MIT 1020 | 1 |
| Sartorious R160D Analytical Balance | 1 |
| Yamato PPC-200W Balance | 1 |
| Ohaus Scout Pro 400g | 1 |
| J Scale 600 Balance | 1 |
| Acculab SV-100 (200#) | 1 |
| Acculab V-8000 (8000g) | 1 |
| AD HP-40K (41kg) | 1 |
| Ohaus Scout Pro 400g | 1 |
| Ohaus Scout Pro SP4001 | 1 |
| Oakton pH6 Acorn Series | 1 |
| Carbolite CWF 12/23 PID oven | 1 |
| Analog controlled lab oven | 1 |
| Calibrated weight set | 1 |
| Thomas Sci. 1222CM Microscope | 1 |
| Thomas Sci. 1254SH Microscope | 1 |
| Bausch & Lomb Microscope .7-3X | 1 |
| LaMotte Smart Colorimeter | 1 |
| 1000 mL graduated cylinder | 1 |
| Thermo Orion Dis Oxy Sensor #850 | 1 |
| Atago Refractometer #83011 | 1 |
| Cole Parmer Dual syringe pump | 1 |
| Fisher FS30 #9493704 | 1 |
| Fisher FS140 #9493709 | 1 |
| Mirak Hotplate (Digital) #HP72935-60 | 1 |

| | |
|---|---|
| 60 deg BYK gloss meter | 1 |
| Dial Barometer Model: 14-648-51 | 1 |
| Salt Spray Cabinet | 1 |
| H Series air mixer | 1 |
| S Series 2HP air mixer | 1 |
| Small air mixer | 1 |
| Small air mixer | 1 |

HPC

| Equipment | Quantity |
|---|---|
| Enclosed Spray Booth 14 x 14 new and unassembled | 2 |
| Open Spray Booth 18' new and partially assembled | 1 |
| Sand Blaster (Standard) 4 x 4 | 5 |
| Glass Bead Blaster (suction cabinet) 4 x 4 | 1 |
| Wash Tanks/heaters/pumps/baskets | 1 |
| 7 Zone IR | 1 |
| 1 Zone IR Flash | 1 |
| 2 Zone IR Preheat | 1 |
| Gas Fired Oven - Wisconsin (6'x9'x6') | 1 |
| Conveyor System - Unibilt | 1 |
| Royson Vibratory (Large) | 2 |
| Enclosed Spray Booth 14 x 14 | 2 |
| Open Spray Booth 10' | 2 |
| 200 HP Quincy Compressor | 1 |
| Dominic Hunter - CRD2000 Dryer | 1 |
| 3750 Gallon Tank | 1 |
| 60 Gallon Flam Cabinet | 7 |
| 45 Gallon Flam Cabinet | 2 |
| 12 Gallon Flam Cabinet | 4 |
| 4 Gallon Flam Cabinet | 5 |
| Pallet Scale | 1 |
| Wulftec Smart Series Shrink Wrapper | 1 |
| Open Spray Booth 18' | 1 |
| Wire Baskets | 25 |
| Bander | 1 |

Schedule 2.1.2 Assigned Contracts and Leases
HPC

| Name | Description |
|------|-------------|
| Balboa Capital/Banc Of America Leasing | Storage racks, Packaging machines |
| Balboa Capital/Banc Of America Leasing | Finishing Machine |
| National City/Huntington | Manufacturing equipment |
| Royal Bank of America | Spray booths |
| GE Commercial Finance | Walk-In oven |
| GE Commercial Finance | Walk-In oven |
| Key Equipment Leasing | Epicor Software |
| Direct Capital Corp | IR Oven |
| Zanett Opportunity Fund, Ltd | Specific Production Equipment |
| Fort Ashford Funds, LLC | Blanket Lien on Assets |

Schedule 2.1.2 Assigned Contracts and Leases
JHT

| Name | Description |
|------|-------------|
| Michael Novakovic | Specific Equipment |
| Zanett Opportunity Fund, Ltd | Specific Production Equipment |
| Fort Ashford Funds, LLC | Blanket Lien on Assets |

Schedule 2.1.2 Assigned Contracts and Leases
NCO

| Toshiba Financials/GE Capital | Copier |
|---|---|
| ZANETT Opportunity fund, LLC | Coating Equipment |
| Fort Ashford Funds, LLC | Blanket Lien on Assets |

Schedule 2.1.2 Assigned Contracts and Leases
NTC

| Fort Ashford Funds, LLC | Blanket Lien on Assets |
|---|---|

Schedule 2.1.3 Inventory
HPC

North Carolina Plant:

| Item Name | | Unit Type (gallon, lb, each, etc) | Quantity |
|---|---|---|---|
| | [Green] | gallon | 0.1 |
| #8 Glass Bead | | lb | 100 |
| 1 1/2" Tape | | roll | 11 |
| 1' Wire brushes | | ea | 96 |
| 1" Tape | | roll | 88 |
| 1/2" Tape | | roll | 11 |
| 1/2" Wire Brushes | | ea | 72 |
| 1/4" Wire Brushes | | ea | 24 |
| 2" Roloc Disc | | ctn | 4 |
| 2" Tape | | roll | 12 |
| 3" Tape | | roll | 30 |
| 3/8" Nylon Brushes | | ea | 140 |
| 3/8"Wire Brushes | | ea | 48 |
| 32" x 18 x 10  Box | | ea | 101 |
| 44" x 19 x 14 Box | | ea | 107 |
| 63" x 19 x 12 Box | | ea | 62 |
| Aluminum Oxide 100 grit | | lb | 400 |
| Aluminum Oxide 60 grit | | lb | 1900 |
| Bailing Wire | | roll | 0.10 |
| Black Strappling | | roll | 1 |
| Blaster Lens Protectors | | ea | 40 |
| Blaster Light Bulbs | | ea | 5 |
| Blasting Gloves   [L] | | ea | 1 |
| Blasting Gloves   [R] | | ea | 1 |
| Blasting Hose | | ft | 20 |
| Blasting Nozzle | | ea | 3 |
| Blasting Nozzle Hsg | | ea | 3 |
| Bubble Wrap | | roll | 9 |
| Coconut Soap | | gal | 55 |
| Dry Lube | | can | 34 |
| Dust Masks | | box | 1 |
| Foam | | roll | 0 |
| Globrite | | gal | 15 |
| Latex Gloves | | box | 33 |
| Luster-all | | lb | 320 |
| MX-HT   [line oil] | | gal | 5 |
| n1001 | [Sterling] | gallon | 9 |
| n2001 | [Marine Gold] | gallon | 0.5 |
| n2002 | [Black] | gallon | 7 |
| n2003 | [Acid Blue] | gallon | 0.1 |
| n2010 | [DarkGray] | gallon | 2 |

| | | | |
|---|---|---|---|
| n2011 | [Cast Gray] | gallon | 0.75 |
| n2012 | [Corvette Gray] | gallon | 0.25 |
| n2019 | [Light Gray] | gallon | 0.5 |
| Packaging Staples | | box | 6 |
| Packing Tape | | roll | 48 |
| PS-015 | [E-series base coat] | lb | 30 |
| PS-075 | [E-series top coat] | lb | 12.5 |
| Respirator canister filters | | 2 pk | 10 |
| Respirator Pancake Filter | | 2 pk | 19 |
| Respirators | | ea | 3 |
| S04G | [Green SDF] | gallon | 10 |
| S06K | [Black SDF] | gallon | 0.9 |
| S09-S | | gallon | 0.95 |
| Safety Glasses | | ea | 12 |
| SOL99 | [Solvent] | gallon | 10 |
| Stretch film | | roll | 1.50 |
| Tyvek Apron | | case | 0.50 |
| Tyvek Sleeves | | case | 0.40 |

Oklahoma Plant:

| Description | Unit | Inventory |
|---|---|---|
| 1" Standard Blk Hose Nipple (barb nipple) | Each | 2 |
| 12" Singlefaced carboard | Each | 0.25 |
| 120 PAR 38 / H / FL  Blast Cabinet Flood Lights | Each | 6 |
| 40% Coconut Soap 55 gallon Drum | Drum | 75 |
| 5 gallon water jugs | Each | 7 |
| 70% Alcohol 1 quart bottle | Each | 8 |
| Acetylene (390 cubic foot acetylene) | Bottle | 1 |
| Ball Seat (depressurization valve metal seat) | Each | 4 |
| Blast Glass polyester plastic roll 52.5"x100' cut in half | Roll | 2.5 |
| Blast Glove 1 pair L/R | Each | 2 |
| Blast Hose, 1" ID for discharge valve | Feet | 15 |
| Blast Hose, Goodyear 1/2" Id 1 1/8" od | Feet | 25 |
| Blaster Glass, large:  14" x 22", 3/16" thick (rounded corners) | Each | 1 |
| Blasting helmet Inner lens (5 each) | Each | 11 |
| Blasting helmet outer lens (25 each) | Pack | 25 |
| Booth Filter, 20x20 Paint Arrestor Pads 100/case | Case | 4 |
| Box Tape 2" x 110 yards Clear | Case | 1.25 |
| Box, stock 12x12x12 200 lb | Each | 25 |
| Box, stock 24 x 24 x 12  15/bundle | Each | 50 |
| Box, stock 24x12x12  200 lb  25/bundle | Each | 40 |

| Item | Unit | Qty |
|---|---|---|
| Bubble Wrap 3/16 x 24" x 300' | Each | 1 |
| Butcher Paper (Gold Seal) 30 x 1100 | Each | 0.5 |
| Carburetor cleaner (spray can) | Each | 5 |
| Cold Galv Wax (or UY) Hot 2000 Roll # 25 x 6" | Each | 11.6 |
| Coupling Gaskets (quick disconnect) | Each | 12 |
| Cymax (packing styrofoam) | Bag | 8 |
| Glass Beads #13 | LB | 350 |
| Glex X-mall (12"/23-1) 5/8"/3/16" thick (round combo) | Each | 7 |
| Gloves, Brown Jersey | Dozen | 5 |
| Grit 100 | LB | 300 |
| Grit, 16 | LB | 50 |
| Grit, 18 | LB | 100 |
| Grit, 60 | LB | 200 |
| H02 Acid black | GL | 23 |
| H05 Basecoat | GL | 20 |
| H05.P Basecoat | GL | 9 |
| H10 Acid grey | GL | 1.25 |
| Haze Grey powder coating | LB | 55 |
| Haz-mat / Paint booth filter waste drums (ready-to-dispose) | Each | 23-30 |
| Header Bags 18.5x15.6x43.75 | Rb | 0.75 |
| HP LaserJet 1022 Toner Cartridge | Each | 1 |
| HPC 1/X"1 X 8.25 CD50CH (ID foam) | Each | 200 |
| Inhibitor # 4 | GL | 2.5 |
| Latex gloves (powder free) L 10 bx/case | Box | 13 |
| Latex gloves (powder free) XL 10 bx/case | Box | 18 |
| Lay Flat Tubing 14 x 1.5 mil | Roll | 0.75 |
| Lay Flat Tubing 8" x 1.5 mil | Roll | 1.25 |
| Light fixtures Empire | Each | 3 |
| M Standard Tork Towels | Each | 6 |
| Metering Tube (1/2" pinch tube) | Each | 2 |
| Oven Chart Sheets (Bailey) cust #173763-0001 | Each | 2 |
| Paint roller, 1/4 medium nap | Each | 4 |
| Powder, Base, NiCr "nickel-chrome" A122 10# bottle | LB | 20 |
| Propane (fork truck) | Tank | 1 |
| Quantum - basecost | GL | 0.1 |
| Quantum - midcoat | GL | 0.1 |
| Quantum - topcoat | GL | 0.1 |
| Quick Disconnect Coupling 1" FNPT crowsfoot | Each | 10 |
| Razor blades | Box | 10 |
| S06-K (Xylen 1620 black) | GL | 1.25 |
| Safety Glasses, Radians Cobalt Black/Clear | Each | 8 |
| Scotchbrite pads | Each | 24 |
| Sealing Valve O-RING | Each | 4 |

| Item | Unit | Qty |
|---|---|---|
| Shipping Bags, 10 x 9x 3002ml (500) | Each | 1000 |
| Shipping Bags, 6 x 18 .0015 mil Lincoln Ind | Each | 300 |
| Shipping Bags, 7 X 28 .0015 mil Lincoln Ind | Each | 1500 |
| Solvent 54 | GL | 5 |
| Solvent 99b | GL | 4.5 |
| Spray Mask, 3M Half Facepiece Respirator Large | Each | 3 |
| Spray Mask Filter Retainer Ring | Each | 3 |
| Spray Mask, Organic Gas Cartridge pair | Each | 15 |
| Stretch wrap x / case | Each | 15 |
| Thermal Masking Tape 1" x 36yds (Glass Cloth Tape) | Each | 3 |
| Thermal Masking Tape x 36yds (Glass Cloth Tape) | Each | 2 |
| Toilet paper (office) 16640 Tissue 40/cs | Rolls | 18 |
| Toilet paper (shop) 12 02 44 Tissue | Rolls | 18 |
| Trash Bags Clear 33 gal | Rolls | 60 |
| Vinyl Tape, 1/4" Yellow  72/case | Each | 4 |
| Vinyl Tape, 1", Yellow  36/case | Each | 1 |
| Vinyl Tape, 1/2" 0.5" Yellow  36/case | Each | 4 |
| Vinyl Tape, 3", Yellow | Each | 1 |
| Wire, 17 gauge | Each | 0.5 |
| Xylan 1010 / 870 black | GL | 2.5 |
| Xylan 1424 / D1673 Green 424 (aka S10-G) | GL | 18 |

Schedule 2.1.3 Inventory
JHT

| Item Name | | Unit Type (gallon, lb, each, etc) | Quantity |
|---|---|---|---|
| #8 Glass Bead | | lb | 50 |
| 12" x 10 x 8  Box | | ea | 150 |
| 24" Poly Tubing | | roll | 0.5 |
| 28" x 12 x 10 Box | | ea | 130 |
| 32" x 19 x 10  Box | | ea | 90 |
| 38 x 20x 18  Box | | ea | 50 |
| 40" x 20 x 12 Box | | ea | 30 |
| 44" x 19 x 14 Box | | ea | 10 |
| 64" x 19 x 12 Box | | ea | 70 |
| 8" Poly Tubing | | roll | 0.8 |
| Aluminum Oxide 60 grit | | lb | 150 |
| Blaster Light Bulbs | | ea | 1 |
| Blasting Gloves   [L] | | ea | 2 |
| Blasting Hose | | ft | 6 |
| Blasting Nozzle | | ea | 2 |
| Blasting Nozzle Hsg | | ea | 2 |
| Bubble Wrap | | roll | 3 |
| Coconut Soap | | gal | 40 |
| Copy Paper | | ream | 8 |
| Cotton Gloves | | doz | 17 |
| Duct Tape | | roll | 1 |
| Dust Masks | | box | 2 |
| Foam | | roll | 2 |
| Grease  [high temp] | | tube | 10 |
| Green Tape | | roll | 3 |
| Luster-all | | lb | 200 |
| MX-HT   [line oil] | | gal | 5 |
| Mylar | | roll | 11 |
| n1004 | [Extreme Sterling] | gallon | 36 |
| n2002 | [Black] | gallon | 11 |
| n2010 | [DarkGray] | gallon | 1 |
| n2011 | [Cast Gray] | gallon | 0.5 |
| n2019 | [Light Gray] | gallon | 0.75 |
| Packaging Staples | | box | 5 |
| Packing Tape | | roll | 30 |
| Respirator Filters | | pk | 3 |
| Respirators | | ea | 3 |
| S04G | [Green SDF] | gallon | 0.5 |
| S06K | [Black SDF] | gallon | 1 |
| Safety Glasses | | ea | 10 |
| SO6-B | [Blue SDF] | gallon | 0.5 |
| SOL99 | [Solvent] | gallon | 1 |
| Vinyl Gloves | | box | 3 |

| Item Number | Description | U/M | Quantity on Hand |
|---|---|---|---|
| 4037 | Aluminum Hy | KG | 12 |
| 3060 | 138400W | EA | 240 |
| 4066 | 1424 Green | GAL | 5 |
| 4080 | 1500 slow cure | KG | 6 |
| 4063 | 1620 Black 870 | GAL | 3 |
| 4081 | 500 ml t-butyl acetate | EA | 2 |
| 4092 | 531 Primer A | GAL | 5 |
| 4093 | 532 Primer B | GAL | 5 |
| 4033 | 5G Green Pigment | LB | 500 |
| 1279 | 63MM White Cap | EA | 240 |
| 4061 | 7709 Black Pigment | LB | 125 |
| 4041 | 85% Phos Acid | LB | 750 |
| 4039 | BLO | LB | 300 |
| 4079 | Butyl Acetate Bulk | LB | 340 |
| 4042 | Chromic Acid Flake | LB | 230 |
| 1289K16 | Dry Film Graphite | GAL | 1 |
| 4090 | Ek 100 part A | GAL | 3 |
| 4091 | Ek 100 Part B | GAL | 1 |
| 4034 | Elastomag 100 | LB | 350 |
| 4030 | H5 Aluminum | LB | 1240 |
| 1459 | Hospeco XL Nitrile | BOX | 3 |
| 4065 | Inhibitor #4 | GAL | 100 |
| 4014 | K393 Black Pigment | LB | 50 |
| 4067 | Large PTFE | LB | 650 |
| 1080 | Latex Glove 10 BX | Box | 2 |
| 4040 | Methyl Isobutyl Ket | LB | 225 |
| 4060 | Molykote 7409 | 5-KG | 1 |
| 4059 | Molykote D10 | 5-KG | 1 |
| 4038 | NMP | LB | 300 |
| 3059 | PB0538499N4/ UN | EA | 240 |
| 1278 | PB35 1 Gal 63-400 | EA | 240 |
| 1458 | PIP XL 13" Mil-GRN | EA | 20 |
| 4035 | Plastic 590 | LB | 1275 |
| 4032 | Small PTFE | LB | 800 |
| 4043 | Titanium Dioxide | LB | 40 |
| 4082 | Tri Fluor | EA | 2 |
| 3097 | UN 1 gal box | EA | 25 |
| 3098 | UN 4 gal box | EA | 25 |
| 1310 | White Knit Rags | BOX | 0.5 |
| 4062 | Xylene 390 Lbs | LB | 375 |
| N2010 | | GAL | 1 |
| N1001 | | GAL | 2 |
| N1003 | | GAL | 2 |
| N3007 | | GAL | 5 |
| S09S | | GAL | 5 |

| N2002 | | GAL | 19 |
| N2001 | | GAL | 21 |
| N3003 | | GAL | 99 |

Schedule 2.1.7 Miscellaneous Assets
NTC

| | |
|---|---|
| Brands and Trademarks | 270,000 |
| Certifications | 270,000 |
| Patented Technology | 250,000 |
| Trade Secrets | 500,000 |
| Know How | 65,000 |
| Agreement with Employee | 45,000 |
| | 1,400,000 |

Schedule 2.2.2 - Customer-owned assets in Seller's possession and identities of customers

HPC
  NC:
  - John Deere – 2 manipulator/material handlers designed to handle their large manifolds.
  - SD Machine – 2 Masking rings and 2 center caps for the coating of their covers
  OK
  - Piper - 14XX series coating in red and white used to mix for pink
  - Industrial Rubber - 2 each, fixtures for their anti-rotation pins.
  - Stroud Safety - About 45lbs of black nylon powder
  - Tier One - Fixtures for their parts. They mask and fixture the part for processing.

JHT
  - Airlane Fabricators – 4 holding fixtures used when polishing their parts.

Liens on Purchased Assets to be terminated, released, transferred to proceeds or otherwise removed at or before Closing Actions

Toshiba

Key Equipment

Novakovic (if applicable)

Zanett (if applicable)

Schedule 5.1.5 Actions

Severance Claim – Filed to the Department of Labor (to NCO) by former Employee, Marcelene Cook for severance pay in the amount of $26,400. (Listed in HPC's petition)

Schedule 5.1.8 Environmental Disclosures

Standard hazardous waste inventory on location:

| Waste Type | JHT | HPC | NCO | NTC |
|---|---|---|---|---|
| Acid Booth Filters | Yes | Yes | - | - |
| SDF Booth Filters | - | - | - | - |
| Acid Waste | Yes | Yes | - | - |
| Solvent/Oil Waste | Yes | Yes | - | - |
| Caustic Waste | - | Yes | - | - |
| Sludge | Yes | Yes | - | - |